# CASES DETERMINED

IN THE

# ST. LOUIS COURT OF APPEALS,

## OCTOBER TERM, 1883.

STATE OF MISSOURI, Respondent, *v.* KATE DOUGLASS, Appellant.

### January 2, 1884.

1. MURDER — INSTRUCTIONS — JUST PROVOCATION. — In a trial for murder where the homicide is either murder in the first degree or justifiable homicide, and where there is no evidence of any provocation, that the trial court, in defining murder in the second degree, failed to define "just provocation," is not ground for a reversal of the judgment.

2. —— EVIDENCE. — It fully appearing that the defendant was employed as a cook at the time of the homicide, it is not error to exclude a question as to what kind of work she did, her character for industry or sobriety not having been attacked.

3. —— It is not error to exclude a question as to whether the witness saw the defendant at the place of the homicide, no time being designated.

4. —— CROSS-EXAMINATION. — A defendant in a criminal case may, when he is a witness on his own behalf, be cross-examined as to any matter pertinent to the issue.

5. —— PRACTICE. — Improper testimony offered by the state in a criminal case should be excluded, though the objection to it be not made specifically.

6. —— Unless questions are clearly impertinent and injurious to the defendant, the court is not bound to interrupt the cross-examination of a defendant who is a witness on his own behalf, when no objection is made by the defendant.

APPEAL from the St. Louis Criminal Court, VAN WAGONER, J.

*Affirmed.*

(1)

Simon S Bass, for the appellant.

Thos. B. Harvey, for the respondent.

Bakewell, J., delivered the opinion of the court.

Defendant was convicted of murder in the first degree. The deceased was killed by a stab from a pocket knife, which penetrated the aorta and caused almost immediate death from internal hemorrhage. The wound was inflicted on a Sunday afternoon in summer, in front of a drinking house frequented by negro prostitutes, in an alley in St. Louis.

The testimony of the witnesses for the state, who were eye-witnesses of the transaction, and who were all colored persons frequenting the house in question, is to the effect, that deceased and defendant were living together in concubinage; that deceased called defendant and some other colored women up to the bar of the house spoken of and drank with some of them, and then went off to the room of one of these women and stayed there a short time with her; that defendant, when this person and deceased came out into the alley, said that they had been having illicit intercourse with one another, and threatened to kill deceased before night; that she sought him in the bar-room and called him out; that they had some conversation outside in a low voice; that deceased put his hand gently upon her and told her to go home or she would be arrested, and that she suddenly stabbed him in the side, before he could make a motion to prevent it. She was arrested within a quarter of an hour, and dropped the knife, which was then closed and bloody with fresh blood, on her way to the station-house.

Defendant, on her own behalf, testified, that she went to see the deceased to ask him for money for her child; that he had been absent for some weeks; that he told her to come back; that she had given him $20 of her own money to keep. He had a knife in his hand paring his nails. When defendant came back again, a woman present said he

had given her $15 to buy a new dress. Defendant remonstrated with him for spending her money on other women. He then threatened to knock her head off. There was some talk of police coming, and she turned her head. Deceased then gave her a blow on the head and she fell. He had his knife out and cut her on the neck; he had his knees on her stomach, and threatened to murder her; she pushed him off. She did not intend to cut him, did not know she was cutting him, and did not know she was cut. She must have had the knife in her hand, it was in her hand when she got up. In answer to the direct question, on cross-examination, she said she supposed he must have fallen on the knife, but didn't know how the blade got turned up. There was no quarrel about women or anything else till she asked him for the money. The knife was closed when she picked it up; there was no blood on it; she peeled an apple for her child with it. She thinks she must have thrown him on the knife, but she did not do it intentionally. As to the blow from deceased, and her being knocked down, the defendant is corroborated by one witness, and contradicted by all the other witnesses who saw the occurrence. The policemen who arrested her both testify that she had no mark of being cut when they saw her, either on the neck or elsewhere, as far as they could see.

The case was given to the jury upon the following instructions: —

" The defendant is charged with the crime of murder in the first degree, by having, on 15th of July, 1882, at the city of St. Louis, feloniously, wilfully, deliberately, premeditatedly, and with malice aforethought, cut, stabbed, and killed Joseph Miller.

" To constitute the crime of murder in the first degree, it is necessary that the killing should have been done feloniously, wilfully, deliberately, premeditatedly, and with malice aforethought. If either of these elements is lacking, the crime is not murder in the first degree.

" By the term ' feloniously,' is meant wickedly, and against the solemn admonitions of the law.

" By the term ' wilfully,' is meant intentionally, and not by accident.

" By the term ' deliberately,' is meant in a cool state of the blood, not in a sudden passion engendered by a lawful, or some just, cause of provocation.

" By the term ' premeditatedly,' is meant thought of beforehand for any length of time, however short.

" By the term ' malice aforethought,' is meant an attempt to do a wrong act formed in and by the mind before the doing of the wrong act is commenced.

" The court therefore instructs the jury, that, if from the evidence they believe and find, that the defendant at the city of St. Louis, and at any time prior to the finding of the indictment, did feloniously, wilfully, deliberately, premeditatedly, and with malice aforethought, assault, cut, stab, strike, and kill Joseph Miller with a knife, as in the indictment is charged, you will find her guilty of murder in the first degree.

" If you find her guilty of murder in the first degree, you will simply so state in your verdict.

" The court has stated to you in these instructions, that, in order to constitute the crime of murder in the first degree, it is necessary that the killing should have been done feloniously, wilfully, deliberately, premeditatedly, and with malice aforethought.

" The court further states to you, and instructs you, that the crime of murder in the second degree differs from the crime of murder in the first degree only in this, that the killing was not done deliberately.

" The court, therefore, instructs you further, that, if from the evidence you believe and find, that, at the city of St. Louis, and at any time prior to the finding of this indictment, the defendant did feloniously, wilfully, premeditatedly, and with malice aforethought, assault, cut, stab,

strike, and kill Joseph Miller with a knife, as is charged in the indictment, and that such killing was not done deliberately, you will find the defendant guilty of murder in the second degree, and assess her punishment at an imprisonment in the penitentiary for a term of not less than ten years.

" The court instructs the jury further, that, if they believe and find from the evidence, that, at the city of St. Louis, in the month of July, 1882, defendant did involuntarily assault, cut, stab, strike, and wound Joseph Miller with a knife, and that the said Joseph Miller did subsequently in the month of July, 1882, die from the effects of the said assault, cutting, striking, stabbing, and wounding, made upon him, the said Joseph Miller, by the defendant, and that such acts were done in the heat of passion, and that said homicide was not justifiable by defendant, you will find defendant guilty of manslaughter in the fourth degree, and assess her punishment at an imprisonment in the penitentiary for a term of two years, or by imprisonment in the city jail not less than six months, or by a fine of not less than five hundred dollars, and imprisonment in the city jail not less than six months.

" Positive and direct evidence of these constituent elements of murder as defined in these instructions is not required ; they may be proved by circumstantial evidence alone, the facts proved must be wholly inconsistent with the innocence of defendant, and incapable of explanation upon any other reasonable hypothesis than that of her guilt.

" If the jury believe and find from the evidence that the defendant had reason to apprehend immediate danger of receiving great bodily harm at the hands of Joseph Miller, the law justifies her in using whatever force and violence that is necessary to protect herself, even to the extent of taking life, and such killing would be justifiable although it might turn out that such appearances of immediate danger were false, that is, if the jury believe from the evidence

that defendant believed that there was reasonable grounds for believing such danger imminent, and acted upon appearances as they presented themselves at the time, then they should acquit defendant.

" The court instructs the jury, homicide is deemed justifiable by the law of this state only when committed in resisting any attempt to murder the person killing, or to commit any felony on him or her, or in any dwelling house in which such person shall be, or when committed in the lawful defence of such person, or of his or her wife, parent, husband, child, master, mistress, apprentice, or servant, when there shall be reasonable cause to apprehend a design to commit a felony, or do some great personal injury, and there shall be reasonable cause to apprehend immediate danger of such design being accomplished, or when necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot or insurrection, or in lawfully keeping or preserving the peace.

" The previous good character of the defendant, if proved to your reasonable satisfaction, is a fact in the case which you ought to take into consideration in passing upon the question of her guilt or innocence of this charge, for the law presumes that a man or woman whose character is good, is less likely to commit crime than one whose character is not good.

" The jury are the sole and exclusive judges of the credibility of the witnesses. With that, the court has absolutely nothing to do. And if you believe and find from the evidence, that any witness or witnesses have wilfully testified falsely to any material fact in the cause, you are at liberty to disregard the whole or any portion of such witness' or witnesses' testimony.

" The law presumes the defendant to be innocent, and the presumption continues until her guilt has been established by the evidence in the case to your satisfaction, and

beyond a reasonable doubt. By the word or term, ' beyond a reasonable doubt,' is meant, convinced to a moral certainty. If you are thus convinced of her guilt, it is your duty to convict ; if not, it is your duty to acquit.

" The court instructs the jury, that it is your duty to pass upon the guilt or innocence of the defendant of the charge of murder in the first degree as charged in the indictment, first.

" If you acquit defendant of that charge, you will then pass upon the guilt or innocence of the defendant of the charge of murder in the second degree.

" If you acquit defendant also of the crime of murder in the second degree, then you will pass then upon the guilt or innocence of defendant of manslaughter in the fourth degree."

1. It is contended that it was error to define the term " deliberately," as meaning in a cool state of the blood, not in a sudden passion engendered by a lawful, or some just, cause of provocation. A blow may be " lawful provocation;" degrading words of reproach may be " just provocation." If the homicide is committed under excitement produced by the former, it is reduced to the grade of manslaughter ; if under excitement produced by the latter, it is reduced to murder in the second degree. If there is excitement of mind produced by provocation, either " lawful " or " just," there is no " deliberation." *The State* v. *Ellis*, 74 Mo. 206. The supreme court so lays down the law in the case just cited, and expressly approves the definition of deliberation given in the case at bar ; but adds that, where there is evidence of such provocation and passion, it is the duty of the trial court to declare as a matter of law whether the provocation sought to be established is such as will mitigate the homicide, and, if so, to leave to the jury the question whether such passion and provocation did, in fact, exist.

In the present case, there is room for only two theories.

If the witnesses for the state are to be believed, defendant, in a fit of jealousy, sought deceased with a deadly weapon in her hand, having previously threatened to kill him before night; and, whilst he was talking peaceably to her, trying to quiet her, and without any provocation from him at the time of the homicide, either by blow, or words, or gesture, stabbed him to death with the knife she brought there with that avowed purpose.   This is murder in the first degree.

If the defendant and Fuller, the witness in her behalf, are to be believed, deceased, at the time, had defendant down, kneeling upon her, cutting her throat, and she stabbed him in her struggle to escape, without intending to do so, and not knowing that she did so ; or else, he fell upon the open knife.   In that case, either the homicide was committed by defendant in lawful defence of herself, when there was reasonable cause to apprehend a design to do her some great personal injury, in which case it was justifiable homicide under section 1235, or else the death was the result of an accident for which defendant was in no way responsible.   There was no evidence warranting an instruction for manslaughter in the fourth degree, which is the involuntary killing of another by a weapon, in the heat of passion, or in any case other than justifiable homicide. Sect. 1249.

The whole testimony on the part of the defence, as to what occurred at the time of the cutting, is confined to the statements of defendant.   The witness, Fuller, saw the defendant knocked down, she says, but saw no more.   The defendant herself says : —

" He gave me a knock on the side of the head, and I fell; and when I turned, he had his knife out again ; and there is where he cut me " (showing her throat).   " I throwed him off of me; and soon he had his knee on my stomach.   I said: Joe, get off me, my stomach is sore.   I had been sick that week, any way, and my stomach was sore then.   And he said: ' You bitch, I will murder you

to-day ; I don't care what I do to-day, so I don't do right.'
And, seeing he was going to cut my throat, I put my knees
up, that way, and threw him off me. And I don't care
whether he spent every nickel of it. I didn't intend to
cut him, for I thought so much of him, and spent my
money for him when my child was sick, to cut him like a
brute. I didn't know that I was cutting him. I didn't
know that I was cut. I was so scared, I did not know
what I was doing. I went away, and some of them said,
'Kate, come back and get your child.' I left my child
standing there." In cross-examination, in answer to direct
questions, she said : "We were on the pavement. He
knocked me down on the pavement, and when he struck me
and knocked me down, he jumped on me; this wrestling
round all occurred on the pavement. He was a big man.
When he got on top of me, I just tipped him over, and he
accidentally fell on that knife. I just tipped him with my
knee, and I shoved him on this side of me (the right).
The knife was not on the sidewalk. I had it in my hand.
I must have had it, when it was in my hand when I got up.
I didn't know how the blade got turned up. I throwed him
over. I don't know what he weighed. I don't care how
big a man is who gets me down, I can soon get him off of
me. There was no quarreling before I asked him for the
money. No ill feeling between us, not a bit. All at once
he knocked me down, and jumped on top of me, and said :
'You son of a bitch, I will cut you.' He said he would
cut my throat, and I knocked him off of me. He had a
knife in his hand, a brown handled pocket knife. The
knife I had, must, of course, have accidentally stuck in
him. I stooped down and picked it up. When I picked it
up, it was shut up. I don't know how it occurred. I
didn't do it intentionally. I could not tell you nothing
more about it, if I was telling you until next week. There
was no blood on the knife, — nor could there be, when I

peeled the apple for the child. I did not know he was cut."

The instruction as to manslaughter and murder in the second degree could not prejudice defendant. The failure to declare what was "just" and what was "lawful" provocation in defining "deliberation" could not prejudice the defendant. The case made by the testimony was fully covered by the instructions; and we see nothing in the action of the trial court in this respect to warrant an interference. It is contended that "malice" was improperly defined as, the "intentional doing of a wrong act," because an act may be wrong without being unlawful. However this may be, no wrong act was imputed to defendant by the indictment and evidence which was not also unlawful, and this inaccuracy was quite harmless.

2. The witness Fuller was asked what defendant was doing for a living. The witness said defendant was working at the time of the homicide. The witness was asked what kind of work defendant was doing, and the question was excluded. We see no error in this. The attorney for the defendant stated that he proposed to show by the witness that defendant was an industrious hard-working woman, not given to drinking or to frequenting disreputable places. No attempt was made to impeach the character of defendant for sobriety or industry. It sufficiently appeared by the testimony of Matilda Brown, who was a witness for defendant, that defendant was engaged in the restaurant of the witness cooking and washing, for the five weeks preceding the accident. That the defendant was living in concubinage with the deceased, appeared from the testimony on both sides, and is undisputed.

3. It is objected that the trial court improperly refused to permit the witnesses Clark and Nighton to state what they saw of the affray. A reference to the record shows that they were asked whether they saw deceased and defend-

ant together at Flynn's bar-room. The question was objected to, and the objection sustained, on the explicit ground that the question was not definite as to time. The attorney for defendant made no effort to amend his question; and it is clear from what took place at the time the question was excluded, that the effort was to introduce testimony as to something that passed either before or after the homicide, and not at the time of the affray.

4. It is objected that the court allowed counsel for the state to cross-examine defendant as to matters not testified by her in her examination in chief. No specific questions are pointed out by counsel as objectionable, and we are left to conjecture as to what he means. No objection was made at the trial to any of these questions that was not sustained by the court. It is true that in a criminal case, the court should exclude improper evidence offered by the state, whether the objection made it specific or not. *The State* v. *O'Conner*, 65 Mo. 374. But it is held by the supreme court (*The State* v. *Clinton*, 67 Mo. 391), that the defendant in a criminal case who becomes a witness in his own behalf, occupies the position of any other witness, and may be cross-examined as to any matter pertinent to the issue. It would be going too far to hold that the trial judge must interfere with the course of a cross-examination to which the defendant's counsel does not object, and which may possibly subserve the purpose of the defence.

According to our uniform practice in criminal cases, the whole testimony has been read, and the record has been carefully scrutinized. We see nothing to the prejudice of defendant in any rulings of the trial court. There was testimony to support the conviction, and we believe it to be our duty to affirm the judgment. The judgment is affirmed. All the judges concur.